## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

1.      I, Margaret O'Brien, am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately January 2019.

2.      I am currently assigned to FBI's Organized Crime/Criminal Enterprise Squad in Chicago, Illinois, and my responsibilities include the investigation of criminal violations of federal laws, including wire fraud.

3.      This continuation is made in support of (1) an application for a warrant to search the single family home and barn located at 9169 E. Hoxie Rd, Cedar, MI, 49621 described further in Attachment A-1 (the "**Subject Premises**"), and (2) an application for a warrant to search the person of DONALD HENKEL, as further described in Attachment A-2, for evidence, instrumentalities, and fruits described further in Attachments B-1 and B-2, respectively, concerning mail and wire fraud offenses, in violation of Title 18, United States Code, Sections 1341 and 1343.

4.      The statements in this continuation are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.[1] Because this continuation is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe

---

[1] In particular, I have discussed the aspects of this investigation involving sports memorabilia fraud with an FBI special agent who has been investigating fraud related to sports memorabilia for approximately 20 years, and who has significant training and experience in identifying counterfeit and fraudulent sports memorabilia.

that evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Sections 1341 and 1343, are located at 9169 E. Hoxie Rd, Cedar, Michigan (Subject Premises).

## I. FACTS SUPPORTING PROBABLE CAUSE TO SEARCH

### A. Summary of Probable Cause

5. The FBI has been investigating a scheme to fraudulently sell forged paintings. The forged paintings were sold, or attempted to be sold, between March 2016 and the present.

6. To date, the FBI identified eight probable forged paintings related to the scheme. Five of the eight paintings purport to be previously unknown works of George Ault, an American artist active through the 1940s. Two of the paintings purport to be previously unknown works by Ralston Crawford, an artist with a similar precisionist style to Ault and active through the 1970s. The remaining painting purports to be by Gertrude Abercrombie, an American artist with a surrealist style also active through the 1970s.

7. As set forth in more detail below, one of the paintings has been scientifically examined and determined, based on the materials present in the painting, that it could not have been painted when the painting was dated.

8. Based on information gathered thus far, it is believed that DONALD BRUCE HENKEL, also known as DONAVAN BRUCE KELLY worked with Catherine Allen, located in Florida, William Eatinger, located in California, Patrick Gravel, located in Virginia, and Raymond Paparella, located in Florida, in a scheme

to voluntarily and intentionally defraud Victim 1, Victim 2, and an attempt to defraud Victim 3. In particular, as explained in more detail below, HENKEL and Catherine Allen, whom he supports financially, have received the majority of the proceeds from the paintings that were successful sold, despite having no known legitimate connection to the sales.

9.  As set forth in more detail below, HENKEL resides at the **Subject Premises** and has used the **Subject Premises** to conduct business related to the fraud scheme. For example, as explained in more detail below, HENKEL shipped an item suspected to be a fraudulent painting to Paparella and listed the return address as the **Subject Premises**. FBI has recovered trash from the premises, and recovered items consistent with HENKEL making paintings and sports memorabilia[2] at the **Subject Premises**.

10. As explained below, HENKEL used a telephone assigned (231) 342-3018 (the "HENKEL Phone") to exchange text messages related to the attempted sale of a likely forged painting. On or about June 10, 2020, pursuant to a court order, the FBI began receiving location information for the HENKEL Phone. As explained below, that location information is consistent with the HENKEL Phone being kept by HENKEL at the **Subject Premises**.

---

[2] As set forth in more detail below, HENKEL also appears to be involved in counterfeiting sports memorabilia.

**B.      DONALD HENKEL uses the HENKEL Phone**

11.     According to Verizon records, the HENKEL Phone has been in service since September 16, 2016. Verizon advised user information is held by TracFone Wireless, Inc., a pre-paid, no contract vendor, and no subscriber information is available. However, according to a bank record dated March 26, 2019, this telephone number was provided by DONALD BRUCE HENKEL on his signature card for a Chemical Bank account ending in 9410.

12.     As explained below, the HENKEL Phone has been in contact with each of the suspected co-schemers including telephone number 386-290-7196, used by Catherine Allen, telephone number 734-604-5293, used by Patrick Gravel, telephone number 909-725-7886, used by William Eatinger, and telephone number 561-699-9219, used by Raymond Paparella.

**C.      HENKEL uses multiple bank accounts, one of which is consistent with the Subject Premises**

13.     According Chemical Bank records, the account ending in 9410 is owned by DONAVAN B KELLY, DBA DB HENKEL & DON HENKEL, at an address in Traverse City, Michigan.

14.     According to a bank signature card, dated March 26, 2019, the account ending in 9410 is owned by an individual with the name DONALD BRUCE HENKEL at the **Subject Premises**. The employer name is listed as "Retired artist." The account lists a Michigan driver's license number for which, according to Michigan Secretary of State records, the information matches the information provided to the

bank. The address listed on the driver's license is the **Subject Premises**. HENKEL's license lists his height as 6'4", and his eye color as green.

15.    According to Chemical Bank records, the account ending in 1618 is a sole proprietorship business account, with account owner's name DONAVAN B KELLY, DBA DB HENKEL & DON HENKEL, at an address in Traverse City, Michigan. The tax ID matches the tax ID on HENKEL's account ending in 9410. However, a different driver's license is associated with this account, in the name of DONAVAN BRUCE KELLY.

16.    According to Michigan Secretary of State records, the information provided to the bank matches the information on a driver's license in the name of DONAVAN BRUCE KELLY. I have compared this to the Michigan driver's license in the name of HENKEL associated with the account ending in 9410. Based on my training and experience, the photograph on DONAVAN BRUCE KELLY's driver's license appears to be a photograph of a younger DONALD HENKEL. Both licenses list his height as 6'4", and his eyes as green.

### D.    HENKEL sold paintings purportedly by Ralston Crawford, George Ault and Gertrude Abercrombie

#### 1.    HENKEL sold a purported Ralston Crawford painting for $325,000 through Victim 1 in May 2016

17.    According to records provided by Representative A of Victim 1, in or around March 2016, HENKEL contacted a representative of Victim 1 by e-mail regarding the sale of a painting purportedly by Ralston Crawford. According to an interview of Representative B of Victim 1 on November 19, 2019, HENKEL provided

5

provenance information verbally to Representative B of Victim 1. HENKEL claimed that the painting was originally gifted from the artist to Henry Hotz, Jr., Dean of Arts, Pennsylvania Academy of Fine Arts, who then gifted it to Stanley Smith of Philadelphia, Pennsylvania. It was then bequeathed to Dorothy Wells of Cincinnati who bequeathed it to HENKEL.

18.     In a January 8, 2020 interview with the Representative B of Victim 1 that worked directly with HENKEL, the representative stated that HENKEL provided an address in Ann Arbor, Michigan as his own. Representative B of Victim 1 retrieved the painting from this address. According to public records retrieved through an open-source database, this address is owned by Mark Henkel and Patricia Gravel-Henkel.

19.     According to records provided by Representative B of Victim 1, Victim 1 sold the painting at auction on May 25, 2016 to Victim 3. According to records provided by Representative B of Victim 1 and separate bank records, on June 27, 2016, Victim 1 made a wire transfer for $299,000 to HENKEL's Chemical Bank account ending in 1618.

## 2.     HENKEL sold a painting purportedly by George Ault to Victim 2 and Individual A in August 2017 for $200,000

20.     According to e-mail records provided by Victim 2, in or around February 2017, HENKEL worked through an art dealer, Individual A, to consign a painting through Victim 2. Ultimately, as explained below, Victim 2 purchased the painting from HENKEL rather than selling it on his behalf.

21.     Individual A contacted Victim 2 regarding selling a painting purportedly by George Ault titled "The Homestead" on behalf of his client, whom Individual A later referred to as D.B. HENKEL. Victim 2 estimated that the painting would sell for between $475,000-$500,000, less a 30% commission split equally between Victim 2 and Individual A.

22.     According to a May 20, 2020 interview with Victim 2, typically, as part of an initial conversation about the painting, Victim 2 would obtain a general provenance of the painting prior to agreeing to consign the painting, and later request the provenance in writing. According to e-mail records provided by Victim 2, Individual A sent Victim 2 the provenance for the piece in an e-mail dated March 8, 2017:[3]

> It descended in the family from my client's great uncle, who he remember meeting once when he was a boy. It seems there was little contact after that with this part of the family, but somehow this painting was left to his mother and then given to him at or about her death. He is not sure if his great uncle did truly receive this as a Christmas present from Judson Smith, but it is a possibility given the proximity of where he lived and apparently he did have other paintings and antiques in his home in Albany. The last I am just assuming, given Judson Smith's relationship with the Woodstock artists community, the date of the painting and the date of the gift

23.     Based on information from Victim 2, Victim 2 initially agreed to consign the painting. The dates of consignment were March 7, 2017 through September 7, 2017.

---

[3] All quoted e-mails are set forth without any corrections for grammar or spelling.

24.     According to bank records, on March 21, 2017, Individual A wrote HENKEL a check for $10,000 with the description "payment in advance on George Ault consignment." According to bank records, on July 14, 2017, Individual A wrote HENKEL a check for $5,000 with the description "Ault [ *illeigble* ]". According to e-mail records provided by Victim 2, on July 28, 2017, Individual A sent Victim 2 an e-mail suggesting that if the painting was not sold soon,  HENKEL would be open to any offer from Victim 2 to buy the painting outright and noting that Individual A had already extended HENKEL $15,000.

25.     According to e-mail records provided by Victim 2, on August 4, 2017, Individual A sent Victim 2 an e-mail indicating that his client wanted the payment for the painting wired into two separate accounts. According to records provided by Victim 2, and separate bank records, on August 8, 2017, Victim 2 wired $110,000 to HENKEL's Chemical Bank account ending in 1618, and made a second transfer of $75,000 to an account belonging to Individual B.[4]

26.     Victim 2 also provided a copy of a receipt sent by Individual A to "D.B HENKEL" at an address in Traverse City, Michigan, for payments made in reference to the sale of the George Ault painting, and included a reference to these wire transfers.

---

[4] According to bank records, Individual B received proceeds from paintings sold by DONALD HENKEL and Catherine Allen. According to an open source database, on September 26, 2016, Individual B sold a house in Ormond Beach, Florida to Catherine Allen. The mortgage is listed as being held by a private party vendor.

27.     According to e-mail records provided by Victim 2, Victim 2 became concerned about the authenticity of the painting and contacted Individual A regarding those concerns. On September 28, 2017, Individual A responded in an e-mail that Individual A hoped to provide additional detail on the provenance once "D.B" had spoken with his father. In an e-mail dated November 4, 2017, Victim 2 indicated the piece was not listed in the works provided by the artist in his papers at the archives of American Art. Victim 2 further stated they had a negative report from one conservator who had examined the painting. According to an interview with Victim 2 on January 8, 2020, the conservator believed the painting was made in acrylic paint, a paint type not of the period when the painting was purportedly painted. According to the same interview, Victim 2 had taken the painting to another conservator who believed the painting was not painted in acrylic. Individual A responded on the same date, November 4, 2017, stating there were two dueling "restorers":[5] one who was convinced of the painting's authenticity and one who was doubtful, and encouraged Victim 2 to move forward with "the total conviction that it is right, completely right . . . ." In an e-mail dated February 12, 2018, Victim 2 stated her concerns: "one conservator says that the paint is consistent with what Ault used; the other says that it's a modern forgery because the paint is soluble (???)". According to the January 8, 2020 interview with Victim 2, Victim 2 had a third conservator

---

[5] Although Individual A used the term "restorer" in his e-mail, based on the timing, context, and content of the e-mail, it appears he was referring to the two conservators described above.

examine the painting who did not comment on the paint type, but did think that the application of the paint was strange, almost as if it had been stenciled.

28.     Victim 2 hired Art Analysis & Research to conduct a specific test called a binding media analysis. According to this report, the scientific examination of the paint binding materials revealed the materials were plausible for a painting dated 1938.[6] The report further stated that the binding materials are not diagnostic for that time period as the range of materials analyzed have remained in continuous use. In an e-mail dated March 26, 2019, a representative of Art Analysis & Research indicated the analysis had been done but was not helpful for dating the painting. In this e-mail, a representative of Art Analysis & Research stated the test tentatively detected the yellow pigment "Hansa yellow," which was unusual but not anomalous. The representative further stated that while the pigment could have been available in 1938 its use picked up over a decade later.

### 3.     HENKEL sold a painting purportedly by Gertrude Abercrombie to Victim 1 for $93,750

29.     According to records provided by Representative A of Victim 1, in or around March 2019, DONALD HENKEL contacted Representative A of Victim 1 regarding his interest in consigning a painting in his possession purportedly by Gertrude Abercrombie, titled "Coming Home." According to e-mail records, DONALD

---

[6] The painting in question is signed "G.C. Ault '38" suggesting it was painted in 1938.

HENKEL communicated through e-mail address dbhenkel77@yahoo.com and provided telephone number 734-366-6697.

30.    According to telephone records, telephone number 734-366-6697 is held by TracFone Wireless, Inc., a pre-paid, no contract vendor, and no subscriber information is available.

31.    According to internet provider records, e-mail address dbhenkel77@yahoo.com is registered to a "D.b. Henkel".

32.    According to e-mail records provided by Representative A of Victim 1, on April 16, 2019, DONALD HENKEL provided the provenance of the painting, stating he got it from Thomas Sullivan from Cleveland Ohio, who got it from the estate of the original owners, Henry Schultz and his wife Mary, about 10 years ago.

33.    According to records provided by Representative A of Victim 1, on April 14, 2019, Representative A told HENKEL the painting could sell for an estimate of $20,000-$40,000. E-mail address dbhenkel77@yahoo.com, attributed to HENKEL, responded on the same date, agreeing to the estimate and stating he would ship the painting tomorrow.

34.    According to FedEx shipping records, on April 15, 2019, HENKEL shipped the package with the return address of the Ann Arbor address owned by Mark Henkel, to Representative A of Victim 1. Shipping records indicate a declared value of $1,000 on the item.

35.     According to records provided by Representative C of Victim 1, the painting was sold at auction on May 22, 2019 for $93,750. According to records provided by Representative C of Victim 1, on June 26, 2019, Victim 1 sent the proceeds via a wire transfer of $66,375 to SunTrust Bank account 0683.

36.     According to bank records, SunTrust Bank account 0683 was opened on June 13, 2019 by DONALD HENKEL. The HENKEL Phone is one of the telephone numbers identified for SunTrust customer DONALD HENKEL.

**E.      Catherine Allen, who appears to have been financially supported by HENKEL, sold one of the likely forged paintings in June 2018**

37.     According to records provided by Representative A of Victim 1, in or around March 2018, Catherine Allen sent a letter to Victim 1 regarding her interest in consigning a painting in her possession purportedly by George Ault, titled "Hilltop Farm." The letter indicated the painting was acquired from a family member who lived in Buffalo, New York.

38.     The letter provided an address in Ormond Beach, Florida, and telephone number 386-290-7196. According to an internet search, the address resolves to a UPS Store. According to records obtained by law enforcement, telephone number 386-290-7196 is used by a prepaid customer whose service started on March 6, 2017 and is not associated with any subscriber information.

39.     According to records provided by Representative A of Victim 1, the painting was sold at auction on May 23, 2018, for $38,000. According to records provided by Representative A of Victim 1, the proceeds were sent in two wire

12

transfers on June 22, 2018: one to Allen for $25,950 and one to Individual B for $8,000.

40.    According to bank records, Allen, using a JP Morgan account ending in 1860, received a $25,950 wire transfer from Victim 1 on June 22, 2018. According to bank records, this account was opened on July 9, 2014 by Allen.

41.    According to telephone records, between March 9, 2018 and May 23, 2018, Victim 1 had approximately four telephone contacts with 386-290-7196, the number provided by Allen. According to telephone records, on May 24, 2018, telephone number 386-290-7196 contacted the owner of Victim 1, on a call that lasted approximately 5 minutes. On the same date, telephone number 386-290-7196 contacted the HENKEL Phone on a call that lasted approximately 14 minutes. Based on the timing calls, I believe that HENKEL may have been discussing the sale to Victim 1 with Allen.

42.    According to a report by a Michigan Child Protective Services employee filed with the FBI on September 4, 2012, Catherine Allen and DONALD HENKEL have a child together. According to bank records, in or around April and August 2019, checks were drawn on Henkel's Chemical Bank account ending in 9410, with memo lines referencing the child's school payment. Similarly, according to bank records, between June 27, 2016 and August 18, 2016, HENKEL's Chemical Bank account ending in 1618 was drawn upon for checks to Allen. On August 18, 2016 a wire

transfer of $150,000 was drawn on this account to another account, with the beneficiary listed as Allen.

**F.   William Eatinger sold one of the likely forged paintings in December 2018, and sent most of the proceeds to HENKEL**

43.   According to e-mail records provided by a Representative A of Victim 1, in or around October 2018, Representative D of Victim 1 received an e-mail from someone using the name Bill Eatinger regarding a painting in his possession that he wanted to consign for auction. The painting was purportedly by George Ault and titled "Stacks Up 1st Ave." The e-mail was signed "Bill Eatinger, Highland Ca, BUKSX4@AOL.COM, 909-725-7886".

44.   According to Verizon records, telephone number 909-725-7886 is registered to William Eatinger, at an address in Highland, California. The telephone number has been registered to him since June 30, 2017. According to records obtained by law enforcement, e-mail address BUKSX4@aol.com is registered to "BILL EATINGER," and the phone number provided on the account is 909-725-7886.

45.   According to e-mail records provided by Representative A of Victim 1, on December 6, 2018, the following provenance was provided via Eatinger's e-mail address:[7]

> My father got it from his father, (my grandfather). Who got it from a woman, Leila Mechlin, who I believe was an art critic back in the day......that's all I have on the provenance.....

14

46.     According to records provided by Representative A of Victim 1, Victim 1 sold the painting to Individual C on December 13, 2018. According to open source information, Individual C is a renowned expert in American Art. According to a November 19, 2019 interview with a Representative B of Victim 1, Individual C later communicated to Representative B of Victim 1 that he believed this painting and one other he had purchased later,[8] in addition to other Crawford and Ault paintings sold or in the possession of Victim 1, "did not look right," which Representative B of Victim 1 understood to mean that Individual C believed they were forgeries.

47.     Based on telephone records, on December 13, 2018, telephone number 909-725-7886, attributed to Eatinger, was in contact with a representative of Victim 1 at approximately 1:58 p.m. At approximately 2:22pm, 909-725-7886 made a call to the HENKEL Phone.

48.     According to records provided by Representative A of Victim 1 and corroborated by separate bank records, on January 11, 2019, Victim 1 made a wire transfer to Eatinger's Wells Fargo Bank account ending in 6778,[9] for $135,000. On January 14, 2019, that same account sent a wire transfer for $114,750 to HENKEL's

---

[8] Individual C also purchased the George Ault painting consigned by Patrick Gravel, which, as described below, was later tested. Based on that test, the lab concluded that the painting could not have been painted in the year in which it was dated.

[9] According to a bank record dated August 1, 2017, the Wells Fargo account ending in 6778 was opened as a personal account for sole owner William Eatinger at an address in Highland, California. A search of California DMV records for the driver's license number provided by Wells Fargo revealed that it is registered to William Michael Eatinger, at the same address in Highland, California.

Chemical Bank account ending in 1618, with the description "PAYMENT OF ARTWORK." According to records provided by Representative A of Victim 1 and corroborated by separate bank records, on January 22, 2019, Victim 1 made a second wire transfer to Eatinger's account ending in 6778, for $135,000. According to bank records, on February 5, 2019, that account sent HENKEL's account ending in 1618 a second wire transfer, for $114,750 with the description "PAYMENT OF ARTWORK".

### G. William Eatinger has also sold sports memorabilia and given the majority of the proceeds to HENKEL and Mark Henkel

49.     According to records provided by Victim 4, on December 27, 2017, William Eatinger entered into a contract to sell a Babe Ruth Model 125 Bat at an auction occurring over two days on February 24-25, 2018. The item sold for $60,000 with $1,320 subtracted from the total for "grading fees," and commission for the auctioneer taken out. According to Wells Fargo records, on April 11, 2018, Eatinger received a check from Victim 4 for $52,680. According to Wells Fargo records, on April 17, 2018, Eatinger wrote Mark Henkel[10] a check for $5,500. On April 17, 2018, Eatinger purchased a bank check or draft for $39,288. According to Chemical Bank records, on April 19, 2018, DONALD HENKEL deposited a cashier's check for $39,278.[11] In total, Eatinger gave Mark Henkel and DONALD HENKEL approximately 85% of the proceeds of that sale.

_____

[10] As set forth above, Mark Henkel appears to be the brother of DONALD HENKEL, and the painting purportedly by Ralston Crawford sold by DONALD HENKEL through Victim 1 in May 2016 was picked up by Victim 1 at a home owned by Mark Henkel.

[11] According to the website for Wells Fargo, the bank charges a $10 fee for cashier's checks.

**H.     Patrick Gravel sold a forged George Ault painting in May 2019, and sent most of the proceeds to HENKEL**

50.    According to e-mail records provided by Representative A of Victim 1, in February 2019, a person identifying himself as Patrick Gravel and using e-mail address patrickgrows@gmail.com was in contact with Representative A of Victim 1 regarding a painting in his possession that he wanted to consign for auction. The painting was purportedly by George Ault and titled "Morning in Brooklyn." The same e-mail provided telephone number 804-223-4894.

51.    Records obtained by law enforcement revealed 804-223-4894 to be a Google Voice telephone number, not linked to any subscriber information or call detail records. According to subscriber records, patrickgrows@gmail.com is registered to Patrick Gravel, with a listed recovery SMS 734-604-5293. According to records obtained by law enforcement, the registered user for telephone number 734-604-5293 is Patrick Gravel, and the phone number was active since November 28, 2011.

52.    On March 2, 2019, Patrick Gravel, using the same e-mail address, provided the following provenance:

> My aunt got it from her 1st husband (Howard Young) when she lived in New York. He had gotten it from a college professor named James C. Boundreau.

53.    According to a January 8, 2020 interview with Representative A of Victim 1, Gravel verbally provided the information that he had received the painting from his aunt as a housewarming gift. Representative A for Victim 1 asked if Gravel's aunt's name could be used in the provenance, but Gravel did not want to provide it.

17

54.     According to records provided by Representative A of Victim 1, on May 23, 2019, Victim 1 sold the painting for $270,000 to Individual C. According to records provided by Victim 1, Victim 1 wrote Gravel a check for $238,950.

55.     According to bank records, on June 28, 2019, a check from Victim 1 for $238,950 was deposited into a RVA Financial Bank account ending in 1230. According to records obtained by law enforcement, the RVA Financial Bank account ending in 1230 is registered to Patrick Gravel, at an address in Henrico, Virginia. According to records obtained by law enforcement, on July 10, 2019, Gravel transferred $23,895.00 (exactly 10% of the proceeds) from his savings account to his checking account with the note "PAINTING-PATRICK". On the same day, Gravel drew on the account a cashier's check paid to Mark Henkel for $14,200 (approximately 5% of the proceeds). On July 19, 2019, Gravel drew on the account a cashier's check paid to DONALD HENKEL for $200,855 (approximately 85% of the proceeds).

56.     According to telephone records, telephone number 734-604-5293, the SMS recovery number associated with Patrick Gravel's e-mail account, was in contact with the HENKEL Phone approximately thirteen times between February and July 2019. On May 14, 2019, telephone number 734-604-5293, attributed to GRAVEL, had an approximately two minute telephone call with a representative of Victim 1. The next call from telephone number 734-604-5293 was to the HENKEL Phone, for approximately three minutes.

57.     The purchaser of the painting, Individual C, submitted the painting for scientific testing. According to a December 2019 confidential report from Art Analysis & Research Inc., the painting was scientifically evaluated. The report stated that the analysis detected a type of titanium dioxide white, which indicates that the painting could not have been created until the 1940s. The report further stated that the pigment used remains available today. The painting contains the signature "G.C. Ault '29" falsely suggesting it was painted in 1929.

## I.     Patrick Gravel also sold sports memorabilia and supplied the majority of the proceeds to DONALD HENKEL and Mark Henkel

58.     According to records provided by Victim 5, Patrick Gravel sold a Lou Gehrig Professional Model Baseball Bat through an auction run by Victim 5 on November 15, 2015. The item sold for $120,000, and after commission and a restoration deduction, Gravel received $101,015.00. According to PNC Bank Records, on January 4, 2016, Gravel deposited a check from Victim 5 for $101,015.00. According to PNC Bank records, on January 8, 2016, Gravel wrote checks to Mark Henkel for $4,000, Kate Gravel-Henkel for $5,370.66, Ian Henkel for $2,000, and a check for $1,000 to Loch Alpine Sanitary Authority with the memo line containing Mark Henkel's Ann Arbor address. According to PNC Bank records, Gravel made two wire transfers on January 15, 2016, one for $60,000.00 and one for $16,420.00. According to Chemical Bank records, on January 15, 2016, DONALD HENKEL, using the account ending in 1618, received a wire transfer in the amount of $60,000 with the note "PATRICK JOSEPH GRAVEL." According to PNC Bank records, the

$16,420.00 transfer was made to beneficiary Patricia Gravel-Henkel at 4408 Chris Lane, Ann Arbor, MI.

**J.      HENKEL, appears to be involved in a current effort by Raymond Paparella to sell a painting purportedly by Ralston Crawford**

**1.      Paparella attempts to sell a painting purportedly by George Ault to Victim 3, and contacts HENKEL after the prospective buyer identifies it as an "elaborate fabrication."**

59.      According to records obtained by law enforcement, on August, 21, 2019, HENKEL, listing the **Subject Premises** as his return address, mailed a FedEx Ground package to Raymond Paparella at an address in Boca Raton, Florida. According to an online search, there is a UPS Store at the address in Boca Raton, Florida. The package required a direct signature, had a declared value of $1,000, dimensions of 41"x37"x8", and a weight of 23.9lbs. The package was received on August 26, 2019.

60.      As set forth in Section I.D.1 above (paragraphs 17–19), Victim 3 purchased a Ralston Crawford painting consigned by DONALD HENKEL in 2016. According to records provided by Representative A of Victim 3, on September 26, 2019, a person identifying himself as Raymond Paparella sent an e-mail via e-mail address raypapesq@gmail.com to Victim 3 regarding the sale of a painting purportedly by George Ault, titled "Burghal Barber." In the e-mail, Paparella provided the following information on provenance:

ON the bottom of the frame there is a typed piece of paper that says: wedding gift 1929 for Ben and Rosa Epstein given from their dear friend Esther Goldsmith. On the front of the painting on the lower center on

20

the frame is a brass name plate: Burghal Barber by George C. Ault. The painting is in excellent condition. Although attorney - client privilege prevents me from providing all information, the painting was obtained by my client from the estate of the nephew of the Epsteins.

61.     According to records obtained by law enforcement, e-mail address raypapesq@gmail.com has a subscriber of "Ray Pap" and has recovery telephone number 1-561-699-9219. According to records obtained by law enforcement, telephone number 561-699-9219 is subscribed to by Raymond Paparella.  According to the website for the Florida Bar Association, raypapesq@gmail.com is the e-mail address for the Law Firm of Raymond Paparella, LLC.

62.     According to records provided by Representative A of Victim 3, Victim 3 coordinated the shipment of the painting from Paparella in order to evaluate the painting for purchase. Representative A of Victim 3 provided receipts for the shipment of the painting from and back to Paparella. According to those records, the dimensions of the painting picked up from Paparella were 30"x24", and the size when packaged for shipping was 36"x29"x3". When the painting was returned to Paparella, the dimensions of the return shipment were 35"x29"x4", which are comparable to those listed in paragraph 59 above.

63.     According to records provided by Representative A of Victim 3, on November 12, 2019, Victim 3 sent Paparella an e-mail indicating the painting was evaluated by two conservators who asserted the painting "is not what it is supposed to be" and that Victim 3 believed the painting was "an elaborate fabrication." According to telephone records, on the same date, November 12, 2019, phone records

indicate telephone number 561-699-9219, used by Paparella, had an approximately 40-minute telephone call with the HENKEL Phone.

64.     The HENKEL Phone was in contact with 561-699-9219, used by Paparella, approximately 67 times between August 2019 and January 2020.

## 2.     Paparella is currently attempting to consign a painting purportedly by Ralston Crawford with Victim 1

65.     In approximately October 2019, Paparella contacted Representative E of Victim 1 to sell a painting purportedly by Ralston Crawford titled "Flour Mill." Representative B of Victim 1 assessed the painting would sell for between $200,000 and $400,000. According to e-mail records provided by Representative B of Victim 1, Paparella, using e-mail address raypapesq@gmail.com.com, indicated he was a lawyer representing an unnamed client. Paparella provided telephone number 561-699-9219 and an address in Boca Raton, Florida, belonging to a UPS store. On or about October 15, 2019, Paparella shipped the painting to Victim 1 for evaluation.

66.     In a November 19, 2019 interview of Representative B of Victim 1, Representative B of Victim 1 relayed the provenance as described by Paparella: the painting was originally owned by Theodore Dillaway of Philadelphia, and was given to Charles Barnes and Florence Barnes in 1942 in Philadelphia and then passed to nephew Kay Landers in 1987 and to the present owners in 1998. Paparella said his clients acquired the painting from a private estate at that time. According to Representative F of Victim 1, Victim 1 ended up returning the painting to Paparella.

67.    On April 24, 2020, Paparella, using raypapesq@gmail.com, e-mailed Representative F of Victim 1 regarding consigning the same Ralston Crawford painting. On April 29, 2020, telephone number 561-699-9219, used by Paparella, exchanged six text messages with the HENKEL Phone.

68.    On April 30, 2020, Representative F of Victim 1 placed a consensually recorded telephone call to Paparella at 561-699-9219 regarding the sale of the same Ralston Crawford painting. Representative F of Victim 1 placed the telephone call at approximately 3:30 p.m. UTC.[12] During the call, Paparella clarified he was not selling the painting on behalf of his client, but that his client had given it to him. Representative F of Victim 1 asked to review the provenance of the painting with Paparella. Paparella asked Representative F of Victim 1 to call him back in approximately 5 to 10 minutes so that he could review his notes. The call concluded at approximately 3:43 p.m. UTC.

69.    According to records obtained by law enforcement on April 30, 2020, at approximately 3:44 p.m. UTC, telephone number 561-699-9219, used by Paparella, called the HENKEL Phone. The call lasted approximately 2 minutes and 30 seconds.

70.    At approximately 3:49 p.m. UTC, Representative F of Victim 1 called Paparella again at 561-699-9219, and spoke with him until approximately 4:11 p.m.

---

[12] Because the underlying records are in a variety of time zones, I have converted all times to Universal Coordinated Time, which is 5 hours ahead of Central Daylight Time.

UTC. During the call, Paparella provided the provenance of the painting, consistent with his earlier statement to Representative E of Victim 1.

71.     At approximately 4:44 p.m. UTC, Paparella again called the HENKEL Phone. The call that lasted approximately 18 minutes. At 5:04 p.m. UTC, telephone number 561-699-9219, attributed to PAPARELLA, again called the HENKEL Phone. The call lasted approximately 20 minutes.

72.     According to telephone records, between April 30 and May 14, telephone number 561-966-9219 and the HENKEL Phone, exchanged approximately 121 text messages and approximately 9 telephone calls.

73.     Pursuant to a search warrant, law enforcement obtained the content of some text messages sent by the HENKEL Phone between May 12, 2020, and June 1, 2020. The messages sent by 561-699-9219 to the HENKEL Phone could not be read by law enforcement.[13]

74.     Messages sent from the HENKEL Phone to 561-699-9219 were readable by law enforcement. For example, at approximately 15:49 UTC on May 30, 2020, HENKEL sent Paparella a text message: "Did you have any follow up on that piece yesterday." The previous day, May 29, 2020, Paparella had e-mailed Victim 1 stating that he would not provide the name of the client who gave him the painting

---

[13] The message appears as a series of numbers, letters and backslashes and other characters. Verizon stated the messages could be emojis, gif images, or contact from some Android or Samsung devices. Law enforcement obtained records between May 12 to May 20, 2020, May 27, 2020, and June 1, 2020, resulting in approximately 84 messages from PAPARELLA that could not be read by law enforcement.

purportedly by Ralston Crawford. The HENKEL Phone and 561-699-9219 had two conversations totaling approximately 30 minutes on May 29, 2020.[14]

75. Based on my training and experience, I know that text messages sent and received are commonly stored in the memory of the cellular phones that sent or received them, unless the user specifically deletes the text messages. I therefore believe that the content of the text message sent from Paparella to the HENKEL Phone will likely be stored in the HENKEL Phone. As set forth below, HENKEL appears to keep the HENKEL Phone at the **Subject Premises** when HENKEL is there.

**K.     HENKEL may be forging paintings and sports memorabilia at the Subject Premises**

76. HENKEL appears to reside at the **Subject Premises**. According to a law enforcement database containing property records, HENKEL and Catherine Allen own the **Subject Premises**. According to Chemical Bank records, on January 17, 2019, a check was drawn on from HENKEL's account ending in 1618 to a propane supplier with memo line "Propane 9169 Hoxie". According to Chemical Bank records, on April 25, 2018, a check was drawn from HENKEL's account ending in 1618 to Leelanau County Treasurer with memo line "Taxes 004-029-021-50". According to Leelanau County Property Records, parcel 004-029-021-50 is owned by DONALD

---

[14] Based on their local time zone.

HENKEL and Catherine Allen. As set forth in more detail below, the HENKEL Phone has routinely been located in the vicinity of the **Subject Premises.**

77.    On June 19, 2020, at approximately 8:27am EDT, the FBI observed a male, consistent with the appearance of DONALD HENKEL in his Michigan driver's license photograph, bringing his trash can down the driveway at the **Subject Premises**.

78.    On June 10, 2020, FBI obtained and served a warrant and order to identify the location of the HENKEL Phone. According to information provided by the service provider, Verizon, 13 out of 15 nights observed between June 10 and June 25, 2020, placed the last location of the telephone of the night (local time) at a location consistent with address 9169 E. Hoxie Rd, Cedar, Michigan –The Subject Premises.[15]

79.     For example, on June 21, 2020, at 9:24 p.m. EDT, the telephone was located at this location. At 9:56 p.m. EDT, the ping failed to locate the telephone, indicating the telephone was shut off or was otherwise out of service. At 6:34 a.m. the next day, the reported location of the phone was again consistent with the **Subject**

---

[15] Based on my training and experience and the training and experience of agents familiar with cellular telephone location information with whom I have consulted, cellular telephone companies will report location information based on a variety of sources. These include information about the phone's location report by telephone, as well as information generated by the cellular telephone network, including the particular tower and tower-sector that the phone is connected to and signal strength. Different methods of determining the phone's location result in different zones of uncertainty around the phone's reported location. While this information is generally reliable, it is possible that the report location may be inaccurate. In this case, because the location reported by the service provider is consistent with HENKEL's known address, and because an FBI Agent observed HENKEL at the **Subject Premises** consistent with the reported location of the HENKEL Phone, I believe that the location information is accurate.

**Premises**. An image depicting the location and radius of uncertainty reported by the telephone company for June 21, 2020 at 9:24 EDT appears below:



80.    As described above, HENKEL has previously listed his employer as "retired artist" on bank records. Similarly, according to an article available online and published on September 28, 2012, in "The Rapidian," a man name "D.B. HENKEL" was interviewed, identified himself as an artist, and indicated that he studied art in college. As explained above, HENKEL and Catherine Allen (who, as set forth above, appears to be financially supported by HENKEL) have received the overwhelming majority of the proceeds from the artwork sales.

27

81.     According to PayPal records, HENKEL, using the name DONAVAN KELLY, has spent nearly $1,500 on supplies from a company called "Natural Pigments," which, according to its website, specializes in "supplying artists' materials that were used in historical painting since prehistoric times up to and including the nineteenth century."

82.     According to PayPal records, between January 2016 and January 2020, accounts tied to DBHenkel77@yahoo.com made approximately 191 internet purchases. According to PayPal records, these purchases include a "vintage worth little league baseball," vintage pens from the 1950s, 1960s, and 1970s, Babe Ruth 1933 and 1949 reprint baseball cards, a baseball bat blank, a 1934-1939 William Harridge baseball, and a Joe Jackson-signed baseball bat. On May 29, 2020, FBI conducted a trash cover of the **Subject Premises**. On that date, Agents recovered a November 29, 1990 "Sotheby's American Paintings, Drawings and Sculpture" auction catalog. Several images within this magazine contain a handwritten note of numbers. A July, 1932 "The American Magazine of Art" was also recovered, and contained several highlighted portions. A cover of a June 1935 "The American Magazine of Art" was recovered with handwritten notes on it. A cover of July 1929 "The American Magazine of Art" was also recovered. The time period and subject matter of these publications is consistent with the purported time period and subject matter of the forged and likely forged paintings described in more detail below. In addition, agents found a container of "Japan Drier" marked "Speeds up Dry Time, Use in Oil-based

Paint, Enamel & Varnish" and a jar of what was described by agents as smelling like turpentine, a material often used in oil painting.

83.     On June 5, 2020, FBI conducted a trash cover of the **Subject Premises** and recovered paper towels and a water bottle cut in half - both with what appeared to be paint residue on them.

84.     On June 19, 2020, FBI conducted a trash cover of the **Subject Premises** and recovered sandpaper, paper plates which appeared to have paint on them, two jars containing unknown substances, yellow tape, an empty tube of "kwik wood," a newspaper clipping regarding information on baseball player Willie Mays stamped with the date April 16, 1961, a piece of cardboard with a sketch of what appears to be a human figure, and torn up piece of paper that, when assembled, resembled an image of a baseball bat and an image of an old identification card.

## II.     SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

85.     As described above and in Attachment B-1, this application seeks permission to search for records that might be found in the **Subject Premises**, in whatever form they are found.   As described above and in Attachment B-2, this application also seeks to search for records in HENKEL's possession. One form in which the records might be found is data stored in a cell phone's memory, on a computer's hard drive, or in other storage media.   Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

86.   *Probable cause.*  I submit that if a cell phone, computer or storage medium is found on the **Subject Premises**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my training and experience and discussions with agents who have substantial experience investigating crimes similar to those alleged here, I know that individuals involved in creating fraudulent artwork and sports memorabilia commonly use computers, cell phones, hard drives, and other electronic equipment and storage devices to catalogue, research, communicate about, store information about, and execute their fraudulent schemes. For example, as set forth above, HENKEL communicated by text messages with co-conspirators, by e-mail with victims, and ordered supplies through online retailers.

b.   Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

d.      Wholly apart from user-generated files, computer storage media—in particular, electronic devices' internal hard drives—contain electronic evidence of how an electronic device has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

e.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

87.    Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software,

computer related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.     Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

32

88.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

89.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## III.  PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

90.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found at the places described in Attachments A-1 and A-2 so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

91.     The review of electronically stored information and electronic storage media removed from the places described in Attachments A-1 and A-2 may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

33

a.      examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachments B-1 or B-2;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachments B-1 and B-2 (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachments B-1 and B-2;

d.      opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachments B-1 and B-2.

92.     The government will return any electronic storage media removed from the places described in Attachments A-1 and A-2 within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

34

## IV.    CONCLUSION

93.    Based on the above information, I respectfully submit that there is probable cause to believe that mail and wire fraud offenses, in violation of Title 18, United States Code, Sections 1341 and 1343, have been committed, and that evidence, instrumentalities, and fruits relating to this criminal conduct, as further described in Attachments B-1 and B-2, will be found in the **Subject Premises**, as further described in Attachment A-1, and on the person of DONALD HENKEL, as further described in Attachment A-2. I therefore respectfully request that this Court issue a search warrant for the single family home and barn located at 9169 E. Hoxie Rd, Cedar, MI 49621, more particularly described in Attachment A-1, authorizing the seizure of the items described in Attachment B-1, pursuant to the protocol described in the addendum to Attachment B-1. I further respectfully request that this Court issue a search warrant for the person of DONALD HENKEL, more particularly described in Attachment A-2, authorizing the seizure of the items described in Attachment B-2, pursuant to the protocol described in the addendum to Attachment B-2.

94.    Finally, I plan on executing the search of the **Subject Premises** in conjunction with simultaneous interviews in multiple time zones. For this reason, I anticipate that the search of the **Subject Premises** will not begin until approximately 11 a.m. Eastern Time. Given the size of the **Subject Premises** and the nature of the items to be seized (in particular, artwork) it is possible that law enforcement will not complete execution of the search warrant for the **Subject**

35

**Premises** on the day execution begins. In the event that any occupant of the **Subject Premises** is unable to return and in need of lodging, the FBI will make arrangements at the FBI's expense.